FILED

05 FEB -7 PM 1:45

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ROYCE MATHEW,**

        **Plaintiff,**

**vs.**

**WALT DISNEY STUDIOS,
BUENA VISTA MOTION PICTURE GROUP,
WALT DISNEY PICTURES,
DISNEY ENTERPRISES, INC.,
BUENA VISTA PICTURES DISTRIBUTION, INC., and
BUENA VISTA HOME ENTERTAINMENT, INC.,**

        **Defendants.**

**Case No.** 6:05-CV-152-ORL-22-KRS

Amended
COMPLAINT FOR:
(1) COPYRIGHT INFRINGEMENT;
(2) INFRINGEMENT OF RIGHT OF
    REPRODUCTION;
(3) INFRINGEMENT OF RIGHT TO
    PREPARE DERIVATIVE
    WORKS;
(4) INFRINGEMENT OF RIGHT OF
    DISTRIBUTION;
(5) INFRINGEMENT OF RIGHT OF
    DISPLAY;
(6) INFRINGEMENT OF RIGHT OF
    ATTRIBUTION;
(7) MISAPPROPRIATION; AND
(8) MISAPPROPRIATION OF
    TRADE SECRET (FLA. STAT.
    CH. 688)

---

Page 1 of 200

Plus 186 pages of attached Exhibits

AMENDED
## COMPLAINT

Plaintiff, Royce Mathew sues defendants, alleging the following:

Complaint Index:

Introduction
Jurisdiction
Venue
The Parties
Brief Introduction of the Facts
Factual Background (Part 1 through Part 21)

Part 1 - Events
Part 2 - Story blueprints comparisons
Part 3 - Disney's claim: based on it's famous ride attraction
Part 4 - Disney's deception
Part 5 - Story uniqueness comparisons
Part 6 - Visual comparisons
Part 7 - Dialogue comparisons
Part 8 - Substantial "tells" comparisons
Part 9 - The recipe
Part 10 - Occupational copying practices &  "send in your original ideas"
Part 11 - Disney's copyright filing & "an approach"
Part 12 - Disney's deliberate misdirection
Part 13 - Additional comparisons
Part 14 - Disney's deceptive achievement and marketing practices
Part 15 - Access
Part 16 - Artistic legacy fingerprint
Part 17 - Disney's desperate operation
Part 18 - Multimillion dollar presentation
Part 19 - Correspondence
Part 20 - Time-line of facts and information
Part 21 - Disney profits

The Counts
Prayer for Relief
Demand for Jury Trial
Exhibits (186 pages)

## INTRODUCTION

1.    The Plaintiff, Royce Mathew, (hereinafter "Royce Mathew" or "Mathew" or "Plaintiff" or "the Plaintiff") has filed this action against the Defendants, Walt Disney Studios, Buena Vista Motion Picture Group, Walt Disney Pictures, Disney Enterprises, Inc., Buena Vista Pictures Distribution, Inc., and Buena Vista Home Entertainment, Inc., (hereinafter "Disney" or "Defendants") who have unlawfully engaged in copyright infringement, including the deliberate exploitation of, unauthorized copying of, unauthorized use of, unauthorized live performance of, unauthorized recording of, solicitation, distribution and selling of intellectual property, formula, blueprints and trade secrets especially of his original supernatural pirate story (hereinafter "creative materials", or "supernatural pirate story" or "1994 supernatural pirate movie"), created, authored and owned by the Plaintiff, and legally registered to the Plaintiff under U.S. copyright laws.

2.    Due to several motivating factors including Disney's desperate need for valuable creative materials with which to rapidly manufacture a successful in-house movie in order to boost it's financial profitability and present a positive studio image to it's shareholders and potential investors, and years after failed negotiations with the Plaintiff, and approximately seven years after the publication and commercial distribution of a short, condensed version of the Plaintiff's 1994 supernatural pirate movie, Disney has willfully plagiarized and deliberately infringed upon the Plaintiff's copyright and intellectual property, by copying, exploiting and augmenting the Plaintiff's creative materials, including his secretive formula, structural blueprints and trade secrets. Hence, Disney spent millions of dollars to present in great grandeur the copied, exploited and augmented unique creative materials originated by, crafted, designed and belonging to the Plaintiff as their own creation and property.

3.   As the facts substantiate, Disney has plagiarized the Plaintiff's original supernatural pirate story with it's uniquely crafted fictional inventions and components from his creative materials with which to first manufacture a screenplay, also known as a "script".  After Disney had copied, exploited and augmented the Plaintiff's creative materials for a screenplay, a live performance of this screenplay was recorded onto visual and audio mediums and was then deliberately presented, solicited and distributed by Disney as the, "Pirates of the Caribbean" movie (hereinafter "Pirates of the Caribbean movie" or "Disney's Pirates of the Caribbean movie" or "Disney's 2003 supernatural pirate movie" or "2003 supernatural pirate movie").  Upon it's distribution in 2003, the Pirates of the Caribbean movie had been given a subtitle, "Pirates of the Caribbean: The Curse of the Black Pearl".

4.    Upon closer inspection, as the facts and materials substantiate, at the very least Disney had incorporated some homages and set decorations from their famous Pirates of the Caribbean theme park ride attraction into the Plaintiff's original supernatural pirate story and structural blueprints.  Disney also added the hanging scene from rival studio Universal's "Swashbuckler" movie.  This plagiarizing recipe was then given a multimillion dollar budget and it's resulting yield was deliberately presented, solicited and sold as Disney's Pirates of the Caribbean movie that is based on Disney's famous Pirates of the Caribbean theme park ride attraction, (hereinafter "Pirates of the Caribbean theme park ride attraction" or "Pirates of the Caribbean ride attraction").

5.    Inspection of the materials also substantiate that Disney has also copied and exploited certain portions of the Plaintiff's creative materials for financial profit and prestigious gain for other products, notably their 2002 released animated movie entitled, "Treasure Planet" (hereinafter "Treasure Planet" or "Treasure Planet movie") and related derivative products.

6.   Access, as extensively documented and presented within this complaint, notably in the "Factual Background - Part 15" section, proves that over the course of approximately twenty years, Disney had an abundance of various direct and professional entertainment business access to Plaintiff's creative materials, his secret original formula and trade secrets. This includes Plaintiff dealing directly with Disney, it's close professional entertainment business associates such as the Creative Artists talent agency and the William Morris talent agency, as well as with Michael D. Eisner, Disney's CEO.

7.   As documented and presented within this complaint, it is shown that despite their enormous resource differences, and even when comparing the short, condensed version of the Plaintiff's 1994 supernatural pirate movie to Disney's 2003 supernatural pirate movie, hundreds of preternatural uncanny similarities, near identical and identical uniquely original elements of the structural blueprints, including story, characters, concepts, motivation, development, design, schematic approach, actor's performances and even physical typecasting are revealed.  There are nearly identical scenes with the same unique story and character concepts, elements and information being provided.  Both contain the Plaintiff's specifically designed, secretive and eccentrically crafted original unique story blueprint recipe.  Both have key characters who use the same specific phrases and dialogue.  Some characters speak similar, nearly identical and identically unique dialogue including at the same similarly specific pivotal moments in the story.  Some direction is evidently copied and patterned after the Plaintiff's creative materials, with some scenes containing similar and nearly identical camera angles and character blocking.  None of which appears in Disney's Pirates of the Caribbean theme park ride attraction.

8.    As documented, Disney's Pirates of the Caribbean ride attraction has no story and Disney had received a lack of confidence from it's employees who were hired to assist Disney in manufacturing a movie based upon it.  As documented, Disney repeatedly failed to manufacture a favorable screenplay for a movie based on it's Pirates of the Caribbean ride attraction.  As documented, Disney's "primary financial goals" are to "maximize earnings and cash flow", and to "allocate capital profitability toward growth initiatives that will drive it's long-term shareholder value".  Thus, for enormous financial and prestigious benefits to Disney's various enterprises, Disney unscrupulously copied, exploited, augmented, "plagiarized and harvested" the fruits of the Plaintiff's lifelong dedication and hard work. Disney deliberately infringed, robbed and has willfully deprived the Plaintiff of his rightful ability to exploit and profit from his own creative materials, talents, franchise and artistic legacy.  Disney and their shareholders have greatly profited, continues to profit and have created a legacy to further profit from their infringement and plagiarism of the Plaintiff's talents and his creative materials.

9.    As documented and presented within this complaint, substantial facts exposes Disney's deliberate misdirection, their calculated deception and their unscrupulous practices surrounding the manufacturing of the Pirates of the Caribbean movie.  For example, Disney and it's employees, including it's CEO Michael D. Eisner, proudly promote, continuously represent and relentlessly reinforce to the public, Disney shareholders and potential investors that it had succeeded with it's goal of manufacturing a movie based on it's Pirates of the Caribbean theme park ride attraction.  However, facts and the inspection of the Pirates of the Caribbean ride attraction unequivocally prove that the Pirates of the Caribbean movie is not based on Disney's Pirates of the Caribbean ride attraction, hence Disney and it's employees have deliberately lied; and,

10.   Inspection of the facts and "tells" substantiate that Disney harbors, tolerates and protects a type of unscrupulous plagiarizing operative policy which especially had it's Pirates of the Caribbean movie employees, notably credited producer Jerry Bruckheimer and credited writers Jay Wolpert, Stuart Beattie, Ted Elliot and Terry Rossio each working directly from the Plaintiff's creative materials especially when manufacturing the Pirates of the Caribbean movie screenplay; and, the facts substantiate that Disney had it's credited director Gore Verbinski also utilizing the Plaintiff's creative materials either directly or indirectly for the manufacturing of the Pirates of the Caribbean movie; and,

11.   Facts demonstrate how Disney has some of it's Pirates of the Caribbean movie employees, notably Jerry Bruckheimer, Jay Wolpert, Stuart Beattie, Ted Elliot and Terry Rossio deliberately and continuously misrepresenting the Plaintiff's creative materials as Disney's property.   Thus enabling them, for example, to cunningly take credit for the Plaintiff's creative materials and sell it as Disney's property, as well as to facilitate concealing their plagiarism.   Facts also substantiate how Disney deliberately uses misdirection with which to trivialize the Plaintiff's original ideas, while falsely attributing the Plaintiff's creative materials as part of certain highly acclaimed "Disney Legends" artists' work with the Pirates of the Caribbean ride attraction; and,

12.   The substantial facts and information as documented and presented within this complaint, that substantiate Disney had plagiarized the Plaintiff's creative materials, also substantiates that the unique story, components, including the structural blueprints, formula and dialogue as found in the Plaintiff's 1994 supernatural pirate movie, including his short, condensed version and Disney's 2003 supernatural pirate movie is by no accident or by coincidence, because there are certain self crafted components as well as his original fictional inventions which pinpoints the Plaintiff as the true creator.   For example, in it's haste when copying, exploiting and augmenting the Plaintiff's creative materials, Disney has

prominently featured specific and substantial "tells" of the Plaintiffs creative materials in the Pirates of the Caribbean movie.  As documented, rather than Disney using the highly respected and substantial history of their own Pirates of the Caribbean ride attraction, Disney has instead prominently featured the same history and unique formula as found in the Plaintiff's creative materials in the Pirates of the Caribbean movie. As the facts substantiate, that when Disney had copied, exploited and augmented the Plaintiff's creative materials, they had also copied and exploited the Plaintiff's self crafted original fictional inventions formula with it's uniquely incorporated factual and fictional history from his presentation into the Pirates of the Caribbean movie.  In addition to Disney prominently featuring these substantial "tells" in the Pirates of the Caribbean movie, the Plaintiff's artistic legacy fingerprint is also evident.

13.  In addition to the highly detailed text and visual comparisons, supporting facts that substantiate the Plaintiff's claims have also been detailed within this complaint.  For example, facts unequivocally prove the occupational copying, exploiting and augmenting practices of Disney and some of it's Pirates of the Caribbean movie employees; and,

14.  Facts unequivocally prove the occupational copying, exploiting and augmenting practices, as well as documents the plagiarizing motives of Disney and it's credited writers Ted Elliot and Terry Rossio of the Pirates of the Caribbean movie; and,

15.  As documented, Disney's Pirates of the Caribbean movie employee, credited writer Terry Rossio gave published testimony revealing Disney's policy to allow writers to use and present other writers' creative "script" materials when attempting to manufacture a movie project; and,

16.   Credited writer Ted Elliot gave published testimony admitting that they "had no problem looking for the best idea, no matter what the source" was when manufacturing the Pirates of the Caribbean screenplay and movie; and,

17.   Credited writer Terry Rossio gave published testimony admitting that he is "jealous" and "somewhat resentful" of imaginative writers because he is in a constant state of having "writer's block", which is a mental state of the inability to write, especially creatively.  As documented, credited writer Terry Rossio suffers from "writer's block", especially before and during the manufacturing of the Pirates of the Caribbean movie; and,

18.   For years, especially before and during the manufacturing of the Pirates of the Caribbean movie, credited writers Ted Elliot and Terry Rossio have been beckoning, baiting and encouraging the public and aspiring writers to submit their original creative materials "great ideas" to them, including using their former employer's address as well as for a period of time to a Disney address; and,

19.   Especially before and during the manufacturing of the Pirates of the Caribbean movie, credited writer Terry Rossio gave published testimony firmly warning the public and writers that "your" valuable "ideas will get stolen" by people in the entertainment industry; and,

20.   Justifying their plagiarism, credited writer Ted Elliot gave published testimony calling their practice of copying, exploiting and augmenting other people's creative materials for use in the Pirates of the Caribbean movie a "little homage"; and,

21.   Credited director Gore Verbinski's previous movie, prior to directing the Pirates of the Caribbean movie, was copied, patterned, exploited and augmented from a previously published movie.

22.   Also as documented, Disney's Pirates of the Caribbean movie employees especially credited writers Stuart Beattie, Ted Elliot and Terry Rossio have intentionally aided Disney's unscrupulous deception by reinforcing to the public, Disney shareholders and potential investors that Disney had succeeded with it's goal of manufacturing a movie based on it's Pirates of the Caribbean theme park ride attraction; and,

23.   Former Disney executive and an executive producer for the Pirates of the Caribbean movie Mike Stenson, has aided Disney's unscrupulous deception by reinforcing to the public, Disney shareholders and potential investors that Disney had succeeded with it's goal of manufacturing a movie based on it's Pirates of the Caribbean theme park ride attraction; and,

24.   As producer Jerry Bruckheimer, movie actor Johnny Depp and movie actress Keira Knightley gave published testimony verifying that the Pirates of the Caribbean movie was not based on Disney's Pirates of the Caribbean ride attraction, Disney and especially it's CEO Michael D. Eisner were deliberately lying and continuously deceiving the company's shareholders, the public and potential investors that Disney had indeed succeeded in manufacturing a movie based on Disney's Pirates of the Caribbean ride attraction.

25.   In their limited response, Disney is firm on being uncooperative, showing absolutely no interest in the truth, or the administration of justice. Despite the Plaintiff's credentials and having provided Disney with over twenty detailed pages of compelling facts and color photographs substantiating that his intellectual property was plagiarized, Disney through their corporate cultivated delusional and manipulative games, as documented and presented within this complaint, refuses to afford any cooperation. Clearly through cooperation Disney could have found answers. Yet, as documented and presented within this complaint, Disney employs an unscrupulous defense strategy. Disney continuously

ignores the importance of a logical comprehensive account of facts. Disney unabashedly fabricates and distorts documented facts, attempting to dilute and adulterate the accumulating chronicles. Disney refuses to allow any mutual inspection of various earlier drafts of screenplays and materials. Despite the compelling facts and color photographs substantiating the infringement and plagiarism of the Plaintiff's creative materials presented to Disney, with their correspondence Disney belittles the Plaintiff's attempt to create a logical comprehensive account of facts, sarcastically responding in their May 13, 2004 letter that the Plaintiff is more interested in "controversy" than a "resolution".

26.    As documented, Disney labels over twenty pages of facts and color photographs which the Plaintiff had provided to them as insignificant "snippets". Then when the Plaintiff invited Disney to a courtesy meeting where they would have been able to inspect, handle and review additional items including additional photographs as well as audio and video materials, Disney who has offices, employees, representatives and agents within the State of Florida, arrogantly responded with an excuse to not view the additional materials while condescendingly and repeatedly instructing the Plaintiff to follow it's defense strategy without ever providing any cooperation to the Plaintiff. Disney had even deactivated or changed it's Disney board of directors' company email accounts when the Plaintiff had begun sending electronic copies of his correspondence with Disney, thus preventing him from continuing to do so. As the facts substantiate, Disney isn't interested in the truth or the proper administration of justice, they are only interested in dragging the Plaintiff through it's unscrupulous defense obstacle course.

27.    Several months after Disney refused to afford logical cooperation to the Plaintiff, Disney had distributed a DVD consumer product entitled "The Lost Disk" DVD. As documented, with this "The Lost Disk", Disney had again used it's Pirates of the Caribbean movie employees, especially credited director Gore Verbinski and credited writers Ted Elliot

and Terry Rossio to yet again reinforce to the public, to Disney shareholders and to potential investors that Disney had succeeded with it's goal of manufacturing a movie based on it's Pirates of the Caribbean theme park ride attraction. As documented, Disney had even cleverly edited some of Johnny Depp's and Jerry Bruckheimer's published testimony into video footage on "The Lost Disk", in order to make them appear to be supporting Disney's claims of it's success in manufacturing a movie based on Disney's Pirates of the Caribbean ride attraction; and,

28.    Inspection of Disney's unscrupulous business practices with their deliberately deceptive achievement and marketing techniques of the Pirates of the Caribbean movie reveals that this is not an isolated incident. As with another product they have purposely associated to their Pirates of the Caribbean theme park ride attraction, as documented and presented within this complaint, these specific facts further substantiate that Disney enforces a parasitic policy which directs the incorporation of homages and references to their Pirates of the Caribbean ride attraction into the creative materials of others and then claim the resulting product was based on their Pirates of the Caribbean ride attraction and movie of the same name.

29.    To date, as documented, Disney employees who had worked on the Pirates of the Caribbean movie, specifically credited writers Ted Elliot, Terry Rossio, Jay Wolpert, Stuart Beattie; producer Jerry Bruckheimer, Jerry Bruckheimer Films and it's parent company Jerry Bruckheimer, Inc., (hereinafter "Jerry Bruckheimer") as well as actor Johnny Depp, have all ignored certified correspondence alerting them of the serious matter at hand.

30.    To date, as Disney continues to elicit enormous profits for their companies, their shareholders, large personal bonuses and continuing to gain prestigious recognition from the Pirates of the Caribbean movie, Disney remains pompously defiant of any accountability,

cocooned behind an unscrupulous, uncooperative and manipulative professional demeanor. As the facts substantiate, Disney wrongly expects the Plaintiff to be submissive to it's corporation, and allow Disney to control, dictate and regulate all matters pertaining to his intellectual property and rights. Because Disney has refused to accord even a modicum of logical cooperation, it has left the Plaintiff with an ultimatum, that he either passively follows Disney's defense strategy or face it's expert legal maneuvering skills in court. Clearly, Disney's uncooperative and unscrupulous defense strategy serves no purpose other than to annoy, bully and burden the Plaintiff, hinder the administration of justice and aid in it's goal of escaping accountability.

31.    Absolutely, Disney is not entitled to copying, exploiting, harvesting and augmenting the Plaintiff's creative materials either directly or through it's professional business associates simply because it has an unscrupulous corporate policy to do so. Nor is Disney entitled to the Plaintiff's creative materials simply because Disney harbors or engages in business with individuals who have unscrupulous business principles in order to obtain valuable creative materials. Just because Disney has given the Plaintiff's supernatural pirate story a slick multimillion dollar presentation, does not give Disney the rights to the Plaintiff's creative materials either. However, as already made evident, Disney believes it's high profile, influence, expert legal maneuvering skills and vast resources protects it when it copies, exploits and augments the intellectual property of an independent artist; and,

32.    As already made evident and documented, Disney's corporate attitude towards the Plaintiff, as well as towards a related matter involving Disney's CEO Michael D. Eisner and former Disney employee Michael Ovitz, demonstrates that it is Disney's habitual policy to drag the Plaintiff, the public as well as the courts though it's company "lexicon" brainwashing machine in order to manipulate the facts and dilute the truth. As documented,

it's Disney's habitual practice to have it's employees lie as well as not be "completely candid" until they are compelled to be truthful by being placed under oath.

33.   Therefore, having followed all logical avenues, and with the Defendants conducting themselves as documented, as well as not being able to afford or find appropriate legal representation, the Plaintiff has filed Pro-se with the court.  Filing his complaint Pro-se, the Plaintiff rightfully seeks justice by which to hold the Defendants accountable, which includes forcing the Defendants to stop all transmissions, marketing, distribution and showings; cease the manufacturing of all derivative works;    to surrender all infringing products, manufacturing items and materials regardless of their stored and presentation mediums for their destruction; to stop it's executives, executive producers, producers, writers, director, actors, subsidiaries, shareholders and others from receiving financial gains, compensation and profits;  remediate the effects of their actions; and fully compensate him for their illegal conduct as prescribed by law.

34.   The Plaintiff also asks the court to take Disney's documented uncooperative, unscrupulous and manipulative practices with this matter into account.  Unequivocally, had Disney offered professional courtesy, afforded logical cooperation and practiced decent ethics to address the Plaintiff's serious charges of infringement and plagiarism of his intellectual property, much could have been accomplished in a forum outside of this court.

## JURISDICTION AND VENUE

35.   This is an action for violation of the Copyright Act, 17 U.S.C. § 101, et seq. and particularly, an action for infringement of rights under 17 U.S.C. § 106, § 106A and § 113. It is also an action for related common law claims under Florida law.

36.   Pursuant to 28 U.S.C. § 1331 and § 1338, this Court has jurisdiction over this matter. Additionally, this Court has jurisdiction over the Plaintiffs' pendent and common law claims pursuant to 28 U.S.C. § 1338 (b) and § 1367.

37.   Disney is licensed, qualified to, operates and does transact business in Florida before, during and after engaging in the tortious acts of infringement when manufacturing Pirates of the Caribbean movie, as well as it's distribution and sale, and is subject to the personal jurisdiction of this Court by virtue of 28 U.S.C. § 1400 (a), 28 U.S.C. § 1391, and also the Florida long-arm statute § 48.193.

38.   With regard to 28 U.S.C. § 1391(b)(3), and pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(c), in the interest of justice, venue is proper and absolutely essential in the Middle District of Florida, especially since the State of Florida having the most significant contacts, substantial part of events, materials, and  the conveniences of the parties, witnesses and jury.

## JURISDICTION AND VENUE:
## DEFENDANTS ARE FOUND IN FLORIDA

39.   With regard to 28 U.S.C. § 1400 (a), venue is proper in the Court of Middle District of Florida because: civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights may be instituted in the district in which the defendant or

his agent resides or may be found.   Defendants are not individuals.   Defendants are corporations. Defendants including their offices, employees, representatives and agents are found in Florida; and,

40.    Disney, as well as it's CEO Michael D. Eisner, is found, is qualified to, licensed, operates, promotes, solicits and conducts professional business in Florida, including at the Walt Disney Company's Florida principal place of business.   As documented, Disney has had it's corporate board meetings in Orlando Florida.   Disney recently held it's 2004 institutional investors and analysts conference in Orlando Florida at Walt Disney World. Attached Exhibit A 1.

41.    While conducting professional entertainment business in it's principal place of business in Florida, Disney receives professional business mail, including mail addressed to Walt Disney Studios, Richard Cook, The Walt Disney Company and Walt Disney Company CEO, Michael D. Eisner, all at 1375 Buena Vista Drive - Lake Buena Vista, Florida 32830. For over thirty years the United States Postal Service finds Disney operating daily and year round at 1375 Buena Vista Drive - Lake Buena Vista, Florida 32830, attached as Exhibit A 2.

42.    Disney owns and operates various entertainment businesses, including an established entertainment movie studio in central Florida for the manufacturing and solicitation of movies.   This includes the manufacturing of live action as well as animated movies. Disney's Florida studio was in operation, staffed with Disney employees, and was conducting day to day regular professional business including the manufacturing, solicitation and promotion of both live action and animated movies at the time of Defendant's tortious acts.   Furthermore, this is even verified  in Disney's 2004 form 10-k filing which states Disney's Florida facilities consists of "film and television production facilities", "conference

centers" as well as "hosts feature film and television productions".

43. A substantial aspect of manufacturing the Pirates of the Caribbean movie story and screenplay, which include copying, exploiting and augmenting the Plaintiff's creative materials was done by Disney and it's various employees. The State of Florida had been the Defendant's substantial location during the tortious acts. Disney has offices, employees, representatives and a professional studio facility within the State of Florida when before and especially during, all of the tortious acts of infringement had occurred.

44. Disney was working within the State of Florida and off the Florida coast and were in charge of the hiring and of the controlling of employees which to copy, exploit and augment the Plaintiff creative materials. The Defendants are corporations that had deliberately copied, exploited and augmented the Plaintiff's creative materials, and then made an unauthorized recording of an unauthorized live performance of the Plaintiff's creative materials, which to then distribute and sell including within the State of Florida.

45. As documented, for over a decade, Disney has production facilities, conference centers, offices, employees, telephones, housing, representatives and agents in the State of Florida conducting professional business, including the manufacturing, soliciting, marketing, distributing and selling of movie products, including before and during the tortious act of infringement; and during the unauthorized recording of an unauthorized live performance of Plaintiff's creative materials; and, Disney personally performed acts or omissions giving rise to personal jurisdiction while they were found conducting it's daily professional business within the State of Florida.

46. Thus venue is also proper in the Middle District of Florida pursuant to Florida long-arm statute § 48.193(a) as Disney operates, conducts, engages in and carries business

and business venture in this state or having an office or agency in this state; and,

47.    Venue is also proper in the Middle District of Florida pursuant to Florida long-arm statute § 48.193(b) as Disney has engaged in professional business with the State of Florida before, during and after copying, exploiting and augmenting Plaintiff's creative materials as well as before, during and after the manufacturing, solicitation, distribution and sale of the Pirates of the Caribbean movie.

## JURISDICTION AND VENUE: OWNERSHIP

48.    In the year 2000, Disney gave substantial published testimony that they had provided materials "an internally developed treatment" to it's hired employees and to their specification, assist them in manufacturing a screenplay based on it's Pirates of the Caribbean ride attraction, which would eventually be used for a live performance and recording of it.  Pirates of the Caribbean movie employees and Disney employees, notably Michael D. Eisner gave substantial published testimony, stating that it was Disney's "bright idea of transforming Pirates (of) the (Caribbean ride) attraction into Pirates (of) the (Caribbean) movie", attached as Exhibit B 3.

49.    Pirates of the Caribbean movie employee, credited writer Ted Elliot, gave published testimony stating that "Disney had developed a story of their own" and that Disney had done this "to protect the rights of their " Pirates of the Caribbean "ride" attraction.  Credited writer Stuart Beattie gave published testimony stating that he and the other three credited writers, Jay Wolpert, Ted Elliot and Terry Rossio, were all hired by Disney to write for the Pirates of the Caribbean movie, which was from an "idea conceived by the Disney executives".  Disney also published in it's 2002/2003 annual report, that one

of Disney's  most-loved theme park attractions, Pirates of the Caribbean ride attraction, "sails to the big screen" in the Pirates of the Caribbean movie.

50.    Near the end of the year of 2001, Disney gave published testimony that they hired Jerry Bruckheimer to work for them as they approached their next goal of recording a live performance of the Pirates of the Caribbean movie screenplay that was based on Disney's Pirates of the Caribbean ride attraction.   Producer Jerry Bruckheimer gave published testimony that Disney had contacted him to work with their screenplay for a Pirates of the Caribbean movie.  Jerry Bruckheimer gave published testimony that Disney had given him a screenplay and their guidelines from which to help Disney achieve it's next goal. Producer Jerry Bruckheimer also gave published testimony, stating that they first had to help Disney "shape" it's screenplay.  Pirates of the Caribbean movie employee Ted Elliot, gave published testimony stating that Jerry Bruckheimer came involved with the Pirates of the Caribbean movie after Disney had a developed a story which to protect the rights to their Pirates of the Caribbean ride attraction.  Walt Disney Studios chairman Richard Cook gave published testimony that they had first approached producer Jerry Bruckheimer with a Pirates of the Caribbean screenplay and was seeking to hire Jerry Bruckheimer to assist them in manufacturing the Pirates of the Caribbean movie.  In 2003, Jerry Bruckheimer gave published testimony that he "loved" working for Disney, notably Walt Disney Studios chairman Richard Cook.

51.    Pirates of the Caribbean movie employee Johnny Depp gave published testimony that Disney, notably the Walt Disney Studios chairman Richard Cook was the first to approached him, attempting to get him involved with the Pirates of the Caribbean movie. Johnny Depp, gave published testimony that it was Disney who had first contacted him which to persuade him to involved with the recording of a live performance based on it's Pirates of the Caribbean ride attraction.  Thus Disney, the controlling force as well as the

instigator, perpetrator and instructor of the tortious acts, had it's employees and had hired people to assist them in the recording of a live performance of a Pirates of the Caribbean movie screenplay which is still continuously being solicited as based on Disney's Pirates of the Caribbean ride attraction.

52.   Disney gave substantial published testimony confirming that they had initiated the production, are the employer, and are the controlling force over the manufacturing of a Pirates of the Caribbean movie which they still claim is based on it's famous Pirates of the Caribbean ride attraction.  Thus Disney was the employer ultimately responsible for the hiring of it's employees which to manufacture the Pirates of the Caribbean movie.

53.   As documented, Jerry Bruckheimer did not create nor manufacture Disney's Pirates of the Caribbean ride attraction.  It was Disney and it's employees who had created and manufactured Disney's Pirates of the Caribbean ride attraction.  Jerry Bruckheimer did not have the "bright idea" of recording a live performance of Disney's Pirates of the Caribbean ride attraction.   It was Disney who had the "bright idea" of recording a live performance of it's Pirates of the Caribbean ride attraction.  Jerry Bruckheimer did not hire Disney to manufacture a movie based on Disney's Pirates of the Caribbean ride attraction. It was Disney who had hired Jerry Bruckheimer to assist them in the manufacturing of a movie they claim was based on it's Pirates of the Caribbean ride attraction.  It was Disney who had used it's employees and had hired writers to assist in the manufacturing of the Pirates of the Caribbean screenplay for a live performance recording, which they claim was based on their Pirates of the Caribbean ride attraction.   Jerry Bruckheimer does not own the Pirates of the Caribbean ride attraction.  As documented, Disney owns the Pirates of the Caribbean ride attraction.  As documented, Disney had protected the rights of their Pirates of the Caribbean ride attraction and wanted to manufacture a Pirates of the Caribbean movie based on it's Pirates of the Caribbean ride attraction since November 1998.

54. Once the unauthorized live performance was recorded, Jerry Bruckheimer did not distribute the unauthorized recording. It was Disney who distributed the unauthorized recording of the unauthorized live performance. It was Disney who deliberately continued to represent, solicit and sell the Pirates of the Caribbean movie as being based on their Pirates of the Caribbean ride attraction.

55. Disney is the company which posts and presents the profits and financial accounting of the unauthorized recording of the unauthorized live performance of the Pirates of the Caribbean movie to it's shareholders and potential investors. Expenses of distribution, solicitation as well as the manufacturing of materials of the unauthorized live performance and it's unauthorized recording of the Pirates of the Caribbean movie are accounted for by Disney. Disney owns and controls the only official Pirates of the Caribbean movie website. Disney, in regards to the Pirates of the Caribbean movie, had created a production company, First Mate Productions, Inc., registered with a Disney address for the purpose of copyright law in the United Kingdom. Disney presents the unauthorized live performance recording of the Pirates of the Caribbean movie with it's prestigious company banner, "Walt Disney Pictures" and extensively solicits to it's shareholders and potential investors that it succeeded with it's goal of manufacturing a movie based on it's own Pirates of the Caribbean ride attraction. In their 2003 annual report, Disney proclaims their Pirates of the Caribbean ride attraction is a highly visible symbol of Disney and that the Pirates of the Caribbean movie is "Disney's box office sensation".

56. In 2003, Disney also cross promoted the Pirates of the Caribbean movie with another of their movies which they claimed was also based on another one of it's theme park ride attractions named "The Haunted Mansion". With their precise advertising, Disney deliberately promoted the "Haunted Mansion" movie, with the caption stating, "from the

studio (Disney) that brought you Pirates of the Caribbean" movie.  Thus as published, both the "Pirates of the Caribbean"movie and "The Haunted Mansion" movie have the same Disney companies, Walt Disney Studios, Buena Vista Motion Picture Group, Walt Disney Pictures, Disney Enterprises, Inc., Buena Vista Pictures Distribution, Inc., and Buena Vista Home Entertainment, Inc., and are both deliberately promoted and sold as based on "Walt Disney's" theme park ride attractions.

57.   Upon information, even though producer Jerry Bruckheimer is allowed to mention his working on the Pirates of the Caribbean movie in his biography, Jerry Bruckheimer is barred by Disney from soliciting and displaying the Pirates of the Caribbean movie, including displaying any promotional materials on the Jerry Bruckheimer's official website because Disney is the controlling force and maintains true ownership of the Pirates of the Caribbean movie.  In August 2003, Disney has received registration with the United States Copyright Office as follows: "Preexisting screenplay, author on application"; "Walt Disney Pictures, employer for hire";  "Claimant Disney Enterprises Inc. and Jerry Bruckheimer Inc.", Pa -1-138-412.  Attached as Exhibit B 4.

58.   Upon information and Disney's published testimony, there was no partnership, no co-production nor joint venture between Disney and Jerry Bruckheimer when Disney committed the tortious of infringement by copying, exploiting and augmenting the Plaintiff's creative materials which to manufacture the Pirates of the Caribbean movie.  Upon information and belief, as a prestigious act, it was ultimately Disney's decision to provide, bestow, assign or allow it's employee Jerry Bruckheimer Films and producer Jerry Bruckheimer's company Jerry Bruckherimer, Inc., co-claimant of the copyright to the Pirates of the Caribbean movie.  However, through Jerry Bruckheimer's act of receiving or accepting co-claimant of the copyright, is not a clever means for the Defendants to affect jurisdiction or venue.  Nor through an act of bestowing, giving, providing, assigning or

allowing a company of it's Pirates of the Caribbean movie employee co-claimant of the copyright to the Pirates of the Caribbean movie should allow Disney the clever means which to affect jurisdiction or venue.

59.   Upon information, facts, and belief, Disney with it's Pirates of the Caribbean movie employee's testimony, Disney is the originator, perpetrator, supervising perpetrator and the controlling force of the tortious acts of infringement and plagiarism when copying, exploiting and augmenting the Plaintiff's creative materials; and during the unauthorized recording of an unauthorized live performance of Plaintiff's creative materials; and when marketing, distributing and selling the unauthorized recording of the unauthorized live performance of Plaintiff's creative materials within the State of Florida.

60.   Even though Disney had received registration for the Pirates of the Caribbean movie, Pa -1-138-412, by claiming that there was a preexisting screenplay and the author on copyright application is recorded as Walt Disney Pictures employer for hire, upon information and belief, there is no screenplay nor any written materials entitled "Pirates of the Caribbean" registered with the Copyright Office which correlates to the Pirates of the Caribbean movie as manufactured, solicited and distributed in 2003 by Disney.   Upon information and belief, none of the four credited writers, Jay Wolpert, Stuart Beattie, Ted Elliot or Terry Rossio of the Pirates of the Caribbean movie have a Pirates of the Caribbean movie or similar project registered with the Copyright Office either.   Furthermore, in November 1998 a "Pirates of the Caribbean" screenplay was registered with the Copyright Office under Disney Television and Disney Enterprises.   Upon information and belief, even though this screenplay was never produced,   the titling and designation of this specific registration by Disney in 1998, further substantiate that Disney has always maintain true ownership of their Pirates of the Caribbean ride attraction property.   Disney is the proper

entity which to bring legal action against for their infringement and plagiarism of the Plaintiff's creative materials.

## JURISDICTION AND VENUE: DEFENDANTS'S COPYRIGHT
## CO-CLAIMANT IS FOUND IN FLORIDA

61.   Jerry Bruckheimer Films and Jerry Bruckheimer, Inc., are corporations duly organized, having principle place of business and conducting business throughout the world, including California and Florida.   Jerry Bruckheimer Films. is a corporation and part of Jerry Bruckheimer, Inc., which through Jerry Bruckheimer, Inc., had accepted co-claimant of a distributed product and is registered with the U.S. Copyright Office as co-claimant of the copyright of the Pirates of the Caribbean movie, Pa -1-138-412.. Jerry Bruckheimer with it's subsidiaries, including Jerry Bruckheimer Films, is qualified to and does transact business all over the world, and for the past fourteen years does transact business within the State of Florida including before, during and after the manufacturing the Pirates of the Caribbean movie. Jerry Bruckheimer has been manufacturing and soliciting movie products in Florida such as: "Days of Thunder" in 1990, "Bad Boys" in 1995, "Armageddon" in 1997, "Bad Boys II" in 2002, "Pirates of the Caribbean" in 2002 and "CSI: Miami" in 2002, 2003 and through 2004.

62.   Upon information, several Disney executives of the Pirates of the Caribbean movie and co-claimants of the copyright of the Pirates of the Caribbean movie of Jerry Bruckheimer, Inc.,  including Jerry Bruckheimer, including it's agents and representatives as well as it's principal executives Mike Stenson, Chad Oman and Jerry Bruckheimer can also be found within the State of Florida conducting professional business and residing outside of Disney's scope for the past ten years.

63. Producer, representative and agent Jerry Bruckheimer of Jerry Bruckheimer Films and Jerry Bruckheimer, Inc., gave published testimony that he chooses Miami Florida to manufacture, solicit, distribute and sell movie products within the State of Florida because of the ease of working in Florida. With a principal business of manufacturing movies, Jerry Bruckheimer controlled and affected employees and residents within the State of Florida. Jerry Bruckheimer obtained permits and insurance in order to conduct business in the State of Florida. Jerry Bruckheimer has closed down major city streets for it's manufacturing of movies in the State of Florida. Jerry Bruckheimer's position within his own company has even allowed him to work closely with the law enforcement in the Miami area, even being driven around with the local Miami-Dade police, going on criminal investigations for research for his professional business of manufacturing entertainment products in Florida. Jerry Bruckheimer has also conducted business with Disney and NASA within the State of Florida for the manufacturing, recording, solicitation, distribution and selling of the movie entitled "Armageddon", including having it's world premiere held in Cape Canaveral. It is documented that Jerry Bruckheimer has worked on several movies at the same time, including while he was manufacturing movies within the State of Florida. This includes the Pirates of the Caribbean movie.

64. As with Disney, Jerry Bruckheimer's offices, employees, telephones, housing, representatives and agents, including it's principal executives Mike Stenson, Chad Oman and Jerry Bruckheimer, can be found in the State of Florida working, conducting professional business, including before, during and after the tortious act of infringement when manufacturing the Pirates of the Caribbean movie. As documented, Jerry Bruckheimer was working for the Pirates of the Caribbean movie at the same time Jerry Bruckheimer was working in Florida. The use of portable computers, telephones and electronic transmission easily enabled Jerry Bruckheimer to simultaneously conduct business of manufacturing movies within Florida, California and other locations, all at the same time.